IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| DIGITALIRA.COM, LLC, a Delaware limited liability company, and ALTERNATIVE IRA SERVICES, LLC, a Delaware limited liability company,<br><br>                    Plaintiffs,<br><br>vs.<br><br>THE KINGDOM TRUST COMPANY, a South Dakota corporation,<br><br>                    Defendant. | Case No. 4:19-cv-04147-KES<br><br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## <u>INTRODUCTION</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs DIGITALIRA.COM, LLC ("Digital IRA") and ALTERNATIVE IRA SERVICES, LLC ("Bitcoin IRA") (collectively, "Plaintiffs"), by and through their counsel of record, seek a temporary restraining order and preliminary and permanent injunction enjoining Defendant THE KINGDOM TRUST COMPANY ("KTC" or "Defendant") to restore Plaintiffs' customers' real-time online access to their accounts to process purchases or sales, such as through the Bitcoin IRA platform.  KTC's actions will cause irreparable harm to Plaintiffs, and their customers, if not immediately reinstated.[1] Plaintiffs respectfully submit as follows:

---

[1] We note for the Court that KTC has commenced a trade secret claim against Plaintiffs in Kentucky Federal Court on August 24, 2019.  However, as demonstrated below and the record before the Court, there is a forum selection clause in the controlling agreements between the parties in which KTC reserved for itself and otherwise directed that venue for disputed must be brought in South Dakota.  Thus under the United States Supreme Court standards articulated in Atlantic Marine Const. Co. Inc. v. US District Court for the Western District of Texas, 571 US 49, 134 SCt 568, 574, the forum selection clause should govern venue disputes under 28 USC § 1404(a).

Defendant KTC is the custodian of cryptocurrency assets belonging to its clients' individual retirement accounts ("IRAs"). Plaintiff Digital IRA is an account service provider that facilitates the purchase, sale, and delivery of cryptocurrency assets on behalf of its clients relative to their self-directed IRA or 401k accounts. Plaintiff Bitcoin IRA provides an online platform for clients to self-direct their retirement accounts and communicate purchase or sale transactions of their IRAs' cryptocurrency assets to OTC liquidity providers. Prior to August 23, 2019, Plaintiff Digital IRA assisted its clients in placing their IRA cryptocurrency assets in the possession of Defendant KTC. While those assets were in the possession of Defendant KTC, account holders could utilize the Bitcoin IRA online platform to manage their accounts, including performing real-time purchase and sale of cryptocurrency assets.  Based on the market volatility of cryptocurrency, it is **critical** that customers have real-time online access to their retirement accounts to process purchases or sales, such as through the Bitcoin IRA platform. In order for clients to access their account information on Bitcoin IRA's platform, KTC's clients designated Bitcoin IRA as their "account designated representative" ("ADR") to receive live data about their account status and manage them accordingly. However, after hundreds of Bitcoin IRA clients requested that their assets be transferred to a competitor (with whom both Digital IRA and Bitcoin IRA were also doing business), Defendant KTC unilaterally terminated Bitcoin IRA, and its customers' ability to have online access in retaliation. Furthermore, Defendant KTC has not only delayed, and refused, to comply with customers' requests to transfer their accounts, but has now also unilaterally terminated Plaintiffs' and their customers' ability to get live data and real-time access to their accounts.  Defendant KTC has also engaged in other unconscionable business practices (as alleged in detail in the Complaint and attached declarations) to prevent loss of business, to the detriment of Digital IRA, Bitcoin IRA, and KTC's own clients.

As stated above, on August 23, 2019, Defendant KTC unilaterally, and without notice, terminated Plaintiffs' access to client data, effectively shutting down the Bitcoin IRA online platform.  As a result, not only has Plaintiffs' ability to service these accounts been cut-off, but account holders cannot self-direct their accounts online in real-time to purchase and sell assets and accurately monitor their retirement accounts online. KTC is holding the accounts of these departing clients hostage, while simultaneously defaming Plaintiffs to these clients and irreparably harming Plaintiffs' brand and reputation in the cryptocurrency IRA industry. As such, the Court should require KTC to restore Plaintiffs' access to client data which, in turn, will restore account holder access to Plaintiffs' online platform. By issuing such relief, said account holders will once again be able to self-direct their individual retirement accounts online, 24 hours a day, 7 days a week.

The accumulated evidence more than suffices to satisfy the applicable four-factor *Dataphase* test that applies to this Motion, and a temporary restraining order and preliminary injunction should affirmatively compel KTC (1) to restore access to account holder data for which Plaintiff Bitcoin IRA has been designated by the account holder as the "account designated representative" and (2) to restore the account holder's access to Plaintiff Bitcoin IRA's online platform, thereby allowing the account holders to once again self-direct their retirement accounts online 24 hours a day, 7 days a week. To that end, Plaintiffs respectfully request that a hearing be set as soon as practicable so that this matter is heard and KTC's misconduct is stopped in its tracks.

## FACTUAL BACKGROUND

### A.  The Basics of Cryptocurrency.

Cryptocurrency is a digital asset that may be bought or sold through cryptocurrency exchanges in return for fiat currency. Cryptocurrencies are recorded, distributed, shared, and

replicated on public ledgers, with each unit of currency attributed to unique cryptographic keys. These cryptographic keys can, in turn, be used to send cryptocurrencies between parties.

Specifically, in order to transfer cryptocurrency, the holder of the cryptocurrency must use their unique cryptographic key to authorize a transaction, which is then recorded on the ledger. For this reason, the security of the cryptographic key is critical, as it is used to track ownership of cryptocurrencies, and to purchase or sell cryptocurrency. To that end, given the importance of the cryptographic key, it is necessary for holders of cryptocurrency (or their custodians) to protect the confidentiality of the keys, which are stored in an owner's (or custodian's) cryptocurrency storage, commonly referred to as a "digital wallet."

Not surprisingly, then, a market has emerged where third-party custodians will, for a fee, protect and store digital assets within their digital wallet system. One such method of storage, for example, is the use of "cold storage," where keys are securely stored offline and behind other security access controls, to prevent online attackers from accessing the keys and "stealing" the cryptocurrency (which has occurred to several cryptocurrency exchanges). Other custodians use different methods of storage but, ultimately, the goal is to house and protect digital assets for the account holder.

Storage, however, is only part of the equation. Account holders also need a way to access the digital assets housed with the custodian. To that end, online platforms have been developed that allow account holders the ability to self-direct their accounts and communicate purchase or sale transactions of their cryptocurrency assets online.

**B. An Overview of Plaintiffs' Business.**

Digital IRA is an account service provider, facilitating the purchase, sale, and delivery of cryptocurrency assets on behalf of its clients relative to their self-directed Individual Retirement

4

Accounts ("IRA") or 401k accounts. (Declaration of Chris Kline ("Kline Decl.") at ¶4.) As an account service provider, Digital IRA connects its clients with trust custodians to hold possession of the clients' retirement account assets, digital wallet providers to manage their cryptocurrency, online platform providers (such as Bitcoin IRA) so clients can self-direct their accounts online 24 hours per day 7 days per week, and OTC liquidity providers through whom clients may buy or sell their retirement's cryptocurrency assets. (*Id*.)

Bitcoin IRA, on the other hand, provides an online platform for clients to self-direct their accounts and communicate purchase or sale transactions of their IRA's cryptocurrency assets to OTC liquidity providers. (Kline Decl. at ¶2.) In addition to its online platform, Bitcoin IRA and Digital IRA provide services for BitGo Trust Company ("BitGo Trust"), a qualified custodian licensed and chartered with the State of South Dakota to act as a trust company with respect to clients' retirement accounts, including IRA and 401k accounts. (*Id.* at ¶3.)

### C. Plaintiffs' Relationship with KTC.

KTC is a licensed and chartered custodian approved by the South Dakota Division of Banking as a public South Dakota Trust Company. (Kline Decl. at ¶6.) KTC charges its customers a monthly fee for acting as custodian of their retirement accounts. (*Id*.) KTC also charges its account holders additional fees for specific services, such as buying or selling an asset, transferring a custodial account ("in-kind" or account liquidation), wiring funds, receiving a distribution, or re-registering an account. (*Id*.)

KTC's relationship with Bitcoin IRA is one of custodian (KTC) and online technology platform provider (Bitcoin IRA). (Kline Decl. at ¶7.) To that end, prior to September 5, 2018, Bitcoin IRA agreed to refer some users of its online platform to KTC to serve as their qualified custodian, pursuant to which Bitcoin IRA would receive a referral fee. (*Id*.) On September 5, 2018,

Bitcoin IRA and KTC entered into a referral agreement ("Referral Agreement"), documenting the referral agreement that was previously reached between the parties. (*Id.*)

The Referral Agreement places limits on KTC's ability to terminate and/or change the terms of the Referral Agreement. Paragraph 6 of the Referral Agreement, for example, provides that "[the Referral Agreement] may be terminated by either Party at any time and without incurring any liability provided that the non-terminating Party is given one hundred eighty (180) days written notice." (*See* Kline Decl., Exh. A.) Thus, a minimum of 180 days written notice is required to terminate the Referral Agreement. As for changing clients' account terms, paragraph 13 of the Referral Agreement provides that "Kingdom Trust agrees that any changes to Digital IRA client Kingdom Trust account terms and conditions will be submitted to Digital IRA in writing no less than thirty (30) days before the changes are scheduled to become effective." (*See id*.) As such, a minimum of 30 days written notice is required to change any of its clients' account terms and conditions.

As part of this relationship, Plaintiffs were designated as ADRs and were permitted access to KTC account holder data, in order to provide client services. In addition, Bitcoin IRA served as an administrative watchdog to confirm that KTC managed accounts according to account holders' directives. (Kline Decl. at ¶8.) In particular, Plaintiffs regularly cross-checked and monitored clients' accounts. (*Id.*) In doing so, Plaintiffs routinely verified the amount of crypto inventory in accounts; corrected KTC accounting errors; and addressed overcharges by KTC against Plaintiffs' customers. (*Id.*) Because of their commitment to customer service, Plaintiffs enjoyed high customer ratings, customer confidence, and a credible reputation in the cryptocurrency IRA industry. (*Id.*)

### D.  KTC Uses Unconscionable Practices to Delay Transfer of Account Holder Assets

Given the parties' relationship and Referral Agreement, since at least September 5, 2018, customers whom Bitcoin IRA referred to KTC could utilize Bitcoin IRA's online platform to self-direct their IRA account cryptocurrency and digital assets. However, as of August 23, 2019, that is no longer the case, as set forth below.

The relationship between Plaintiffs and KTC soured when hundreds of KTC account holders began requesting that their retirement accounts be transferred to BitGo Trust (instead of remaining with KTC). Since June 2019, over 800 KTC account holders who are clients of Plaintiffs have requested that their retirement accounts be transferred "in-kind" from KTC to BitGo Trust.[2] (*See* Kline Decl. at ¶9.) Although these KTC account holders submitted these requests, KTC has engaged in numerous practices designed to penalize and retaliate against those account holders and to prevent the transfers from occurring, as described in greater detail below. (*See id.* at ¶10.)

The cumulative effect of these practices by KTC has been to delay and obstruct its account holders' requests to transfer their IRA assets from KTC to BitGo Trust, while continuing to charge its account holders monthly fees during the period of delay, and to cause Plaintiffs harm both in terms of loss of revenue and goodwill.

**E.   KTC Unilaterally Terminates the Relationship with Plaintiffs.**

On August 23, 2019, Jason Anderson, President of KTC, sent a termination notice to Plaintiffs, claiming that it was removing Plaintiffs "from all accounts in which they, or employees and agents of your companies, are listed as Interested Parties and/or Account Designated Representatives" (Kline Decl. at ¶17, Exh. D.) The notice also claimed that KTC would "terminate

---

[2] An "in-kind" transfer of an IRA involves the transfer of IRA assets from one custodian to another, without liquidating the assets and distributing the proceeds. One benefit of an "in-kind" transfer is that account holders are able to avoid the transaction costs associated with liquidation and distribution of assets. In addition, for assets in volatile markets where prices can change substantially in a short period of time (such as cryptocurrency), "in-kind" transfers are preferential for retaining asset value. (Kline Decl. at ¶23.) For example, if cryptocurrency markets rose 10% between the time that the IRA assets were liquidated to when they were transferred to a new custodian, the account holder would be forced to repurchase the same assets at a 10% premium. (*See id.* at ¶23, Exh. I.)

the APIs [application programming interfaces] and File Drops to [Plaintiffs] effective immediately with the last File Drop to occur on August 23, 2019." (*See id.*, Exh. D.)

In addition, on August 23, 2019, KTC also sent to Plaintiffs' customers an email entitled "Termination of Bitcoin IRA relationship" (Kline Decl. at ¶18, Exh. E.) In that email, KTC made multiple false defamatory statements regarding Digital IRA and Bitcoin IRA, including but not limited to claiming that there were "multiple reasons for this termination, all of which revolve around the security of our clients and their assets" (when in fact, Digital IRA, Bitcoin IRA, and BitGo Trust utilize superior security to KTC, and KTC's true motive for termination of the relationship was because KTC's customers were electing to transfer their IRAs to BitGo Trust and utilize the services of Plaintiffs). (*Id.*) The email also represented to Plaintiffs' customers that "all links between Kingdom Trust and Bitcoin IRA will no longer be available, including account access and online trading." (*Id.*) Moreover, the email unilaterally represented to Plaintiffs' customers that "Bitcoin IRA will no longer be your account designated representative and unable to act on your behalf," directly contrary to account holder directives. (*Id.*)

Mere hours later, KTC sent a second email to Plaintiffs' customers titled, "We apologize for the confusion! Your account is not terminated. Your assets are safe. Please read below." (Kline Decl. at ¶19, Exh. F.) In that email, KTC confirmed to Plaintiffs' customers that their account access to the Bitcoin IRA online platform had been disabled but solicited the customers to make a new account with KTC's website. (*See id.*) In that regard, KTC included a link to a PDF file on their website entitled "The Kingdom Trust Crypto Asset Self-Directed IRA – Frequently Asked Questions" (*Id.* at ¶20, Exh. G), where KTC made the following representations:

- KTC only offers $20 million in aggregate insurance on its cryptocurrency holdings (*id.*, Exh. G) (as opposed to BitGo Trust, which offers $100 million in insurance coverage) (*id.*

at ¶3);

- KTC has not completed its SOC 2 Type 2 certification (*id.*, Exh. G) (as opposed to BitGo Trust, which is SOC 2, Type 2 security certified) (*id.* at ¶3);

- KTC claims that account holders "will be your own account designated representative unless you tell us otherwise" (*id.*, Exh. G) (which directly contradicts KTC's claim on August 23, 2019 that Digital IRA and Bitcoin IRA have been removed as "account designated representatives" without customers' consent); and

- KTC claims that it will "now allow in-kind transfers for crypto assets" (*id.*, Exh. G) but does not disclose to customers that it will not perform those transfers within the 30-day period promised in the KTC Custodial Agreement if they request a transfer to BitGo Trust.

On August 23, 2019, Plaintiffs sent a cease and desist letter to KTC, demanding that it retract the defamatory statements made against Plaintiffs and restore Plaintiffs' access to its customers' accounts no later than 5:00 p.m. Central Standard Time on August 24, 2019. (Kline Decl. at ¶21). To date, Defendant KTC has neither retracted its defamatory statements nor restored Plaintiff Bitcoin IRA's access to its customers' accounts. (*Id.*) As a result, KTC account holders cannot access their accounts or buy and sell cryptocurrency using Plaintiffs' online platform, and Plaintiffs have lost the ability to act as a consumer watchdog to access and monitor the account holders' data. (*Id.* at ¶22.)

## **ARGUMENT**

The Court may issue a temporary restraining order and preliminary injunction when it clearly appears from specific facts that immediate and irreparable injury will result to the moving party. *See* Fed. R. Civ. P. 65(a); Fed. R. Civ. P. 65(b).

All four factors enumerated in the *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) test weigh strongly in Plaintiffs' favor. As such, the Court may justifiably exercise the discretion afforded it and enter a temporary restraining order and preliminary injunction compelling KTC to restore Plaintiffs' access to the customer data and, in turn, the customers' access to the Bitcoin IRA online platform.

## A.  Applicable Standard

In the Eighth Circuit, the same standard governs analysis of whether to grant a temporary restraining order or preliminary injunction. The four *Dataphase* factors are:

(1) The probability that the movant will succeed on the merits of his claim;

(2) The threat of irreparable harm to the movant;

(3) The balance between the harm to the movant if injunctive relief is denied and the injury that will result if such relief is granted; and

(4) The public interest.

*KTM North America, Inc. v. Cycle Hutt, Inc.*, 2013 WL 1932797 at *2 (D.S.D. 2013) (quoting *Dataphase*, 640 F.2d at 113).

No single factor is dispositive – all factors must be considered to determine whether, on balance, they weigh in favor of granting the requested relief. *See Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (applying *Dataphase* in context of motion for preliminary injunction). That said, the Eighth Circuit has held that "[t]he two most critical factors for a district court to consider in determining whether to grant a preliminary injunction are (1) the probability that plaintiff will succeed on the merits and (2) whether the plaintiff will suffer irreparable harm if an injunction is not granted." *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976). Among those two facts, the Eighth Circuit has observed that "in deciding to

whether to grant [an] ... injunction, 'likelihood of success on the merits is the most significant.'" *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (citing *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)).

**B.  Plaintiffs are likely to prevail on the merits of their claims.**

"Probability of success" means a fair chance of prevailing on the merits. *Heartland Acad. Comm. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). A reviewing court "ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success." *Dataphase*, 640 F.2d at 113. "[T]he focus in determining probable success should not be to apply the probability language with mathematical precision." *Calvin Klein Cosmetics Corp.*, 815 F.2d at 503. Here, Plaintiffs can readily demonstrate a "fair chance" of prevailing on their tort and contract claims so as to warrant the issuance of the requested injunctive relief.

1.  <u>Tortious Interference with Prospective Advantageous Business Relationship</u>

To establish tortious interference with prospective business relations, Plaintiffs must prove the existence of business relationship, knowledge by the interfering party of that relationship, an intentional and unjustified act of interference causing the harm sustained, and damage to the party whose relationship was disrupted. *See Great West Cas. Co. v. Travelers Indem. Co.*, 925 F. Supp. 1455 (D.S.D. 1996) (citing *Nelson v. WEB Water Dev. Ass'n*, 507 N.W.2d 691 (S.D. 1993)). South Dakota courts follow the Restatement (Second) of Torts (1979), which defines an act of interference as intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *See Janvrin v. Continental*

*Resources, Inc.*, --F.3d—2019 WL 3916532 *3 (citing Restatement (Second) of Torts § 766B cmt. d.)  Plaintiffs have adduced evidence in support of each element and established a likelihood of prevailing on the merits.

With respect to the first factor—the existence of a business relationship—Plaintiffs have developed an excellent reputation within the cryptocurrency IRA industry, in turn allowing Plaintiffs to develop valuable business relationships with their clients and prospective clients. (*See* Kline Decl. at ¶8.) As such, the first factor is met.

As for the second factor—knowledge by the interfering party of that relationship—it too is met. By virtue of its business dealings with Plaintiffs, KTC is aware of the prospective business relationship that exists between Plaintiffs and their clients, and between Plaintiffs and their potential clients, particularly those who have requested KTC to transfer their retirement accounts from KTC to BitGo Trust so that they can use the Digital IRA services and Bitcoin IRA online platform for self-direction of their IRA assets. Thus, there can be no doubt that KTC is aware of the prospective business relationships.

Concerning the third factor—an intentional and unjustified act of interference causing the harm sustained—the factor is met here. As above, KTC has taken numerous steps to prevent the transfer of IRA assets from KTC to BitGo Trust, and has now cut off the ability of KTC's account holders to use the Bitcoin IRA platform to access and self-direct their accounts, clearly changing the terms and conditions of clients' accounts without any advance notice whatsoever. These actions of interference include, but are not limited to:

- removing and restricting access of "account designated representatives" and "interested parties" contrary to account holder directives (Kline Decl. at ¶10);

12

- delaying transfers for weeks or months by repeatedly requiring account holders to submit new and different forms created by KTC (*see id.* at ¶10; Declaration of Roy Trimboli ("Trimboli Decl.") at ¶¶15-16);

- accepting "in-kind" transfers from other custodians but refusing to perform "in-kind" transfers to BitGo Trust (Kline Decl. at ¶¶10, 23);

- increasing the wire fees to transfer cash from KTC accounts (*id*. at ¶10);

- restricting availability of account holders to verify transfer requests to very specific windows of time on very specific dates, subject to change without notice (*id*.);

- requiring account holders to call by phone (and accordingly wait on hold 45-60 minutes) to verify account transfer requests, so that KTC personnel can solicit alternative IRA products in order dissuade customer from transferring their IRA accounts to a new custodian (*id*.);

- decreasing the number of KTC personnel authorized to accept and process client request for transfers (*id*.);

- engaging in aggressive sales tactics to intimidate account holders to rescind their transfer requests (*id*.); and

- withholding information from account holders when the account holder has requested a transfer request (*id*.).

Nor is there any legitimate justification for KTC's actions. By way of example, on June 18, 2019, KTC informed Plaintiffs that it would require "due diligence" to complete the transfers from KTC to BitGo Trust, and also sent emails to account holders informing them that KTC was conducting "internal audits" and therefore needed the account holders to provide additional records. (Kline Decl. at ¶11.) Based on Plaintiffs' staff review, however, the requested records had already been provided to KTC. (*Id.*) Further, the "due diligence" request from KTC (a competitor)

was wholly unreasonable, not required by any law or regulation, and in fact exceeded the information required by the South Dakota Department of Banking, which had licensed BitGo Trust as a trust company since October 2018 (a fact already known to KTC). (*See id*. at ¶12.) Moreover, KTC's own Custodial Agreement with its account holders demonstrates that KTC had no duty to perform "due diligence" prior to effecting the requested transfers. Indeed, Section 8.4 of the KTC Custodial Agreement provides that "[t]he depositor may at any time remove the custodian and name a successor of the depositor's choice by giving 30 days' notice of such removal and replacement. The custodian shall then deliver the assets of the account as directed by the depositor subject to 8.04(e) below [the document does not contain a section matching this presumably erroneous reference]." (*See* Trimboli Decl. at ¶9, Exh. D.) Also, Section 9.4 of the KTC Custodial Agreement states that "Kingdom Trust shall have no responsibility for rendering advice with respect to the investment and reinvestment of depositor's account and shall not be liable for any loss which result from depositor's exercise of control over his/her account. Depositor shall have and exercise exclusive responsibility for control over all the investment decisions concerning the assets of his/her account, and the custodian shall have no duty to question his/her investment directives." (emphasis added). (*See id.* at Exh. D.) Likewise, Section 9.5 of the KTC Custodial Agreement identifies "Prohibited Transactions" (such as transfers to facilitate criminal activity or the sale of property to an account holder's family, none of which apply in this circumstance) and specifically states that "Depositor hereby agrees to be solely responsible for determining and avoiding prohibited transactions and reportable events." (emphasis added). (*See id.* at Exh. D.) In short, there was no need for KTC to conduct "due diligence," and its insistence that it conduct "due diligence" was designed solely to delay and prevent the transfer of IRA assets from KTC to a competitor, BitGo Trust.

Finally, with respect to the fourth factor—damage to the party whose relationship was disrupted—it too is satisfied here. As a result of KTC's delay and refusal to transfer IRA assets from KTC to BitGo Trust, Plaintiffs have suffered irreparable harm to their business reputation and customer goodwill in the cryptocurrency IRA industry. (*See* Kline Decl. at ¶25.) In addition, Plaintiffs have sustained damages, including but not limited to the loss of customers and/or potential customers, the loss of monthly account Platform Fees and transactional IRA Service Fees, and other economic loss. (*See id.*) As such, the fourth factor is also met.

For all these reasons, Plaintiffs have more than met their burden that they have a probability of prevailing against KTC.  On their face, KTC's actions constitute the type of intentional, unjustified actions that the law recognizes as tortious interference. As such, Plaintiffs have established that they have a "fair chance of prevailing on the merits"– and that is all that is required at this stage. *See Heartland Acad. Comm. Church*, 335 F.3d at 690.

    2.  <u>Unfair Competition</u>

KTC's engagement with Plaintiffs' current and prospective clients also gives rise to a meritorious claim for unfair competition, a tort recognized under federal common law and South Dakota common law. Under South Dakota law, "the tort of unfair competition does not have specific elements." *Setliff v. Akins*, 616 N.W.2d 878, 887 (S.D. 2000). Nonetheless, the tort encompasses a variety of activity, including tortious interference with contractual interests—i.e., the specific misconduct alleged in Section B(2) above. *Id.* (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W. 2d 628, 632 (Minn. 1982). Here, because Plaintiffs are likely to prevail on their tortious interference claim, as established above, Plaintiffs are likely to succeed on their claim of unfair competition as well.

    3.  <u>Conversion</u>

Plaintiffs will similarly prevail on their conversion claim. To establish a claim of conversion, Plaintiffs must prove: (1) Plaintiffs owned or had a possessory interest in the property; (2) Plaintiffs' interest in the property was greater than KTC's interest; (3) KTC exercised dominion or control over or seriously interfered with Plaintiffs' interest in the property; and (4) such conduct deprived Plaintiffs of their interest in the property. *Raven Indus., Inc. v. Topcon Positioning Sys., Inc.*, No. CIV. 07-4154, 2009 WL 2998570, at *3 (D.S.D. Sept. 18, 2009) (citing *First Am. Bank & Trust v. Farmers State Bank*, 756 N.W.2d 19, 30 (S.D.2008)). Each of these elements is met here.

With respect to the first factor—Plaintiffs owned or had a possessory interest in the property—the factor is met here. Pursuant to Section 9.4 of the KTC Custodial Agreement, Bitcoin IRA (as the account holders' "account designated representative" ("ADR")) had a possessory interest over its customer account data. (*See* Trimboli Decl., Exh. C.) Indeed, KTC was required to provide such data to Bitcoin IRA "until the custodian receives written notification from the depositor that the account designated representative's appointment has been terminated." In that regard, because KTC *unilaterally* removed Bitcoin IRA has the ADR (as opposed to through written request from the account holder), Plaintiffs have and maintain a possessory interest over the customer account data.

Also, pursuant to Section 8.4(b) of the KTC Custodial Agreement, within thirty (30) days of an account holder requesting to transfer their retirement account assets to BitGo Trust, Digital IRA would have a possessory interest over and be entitled to (pursuant to Digital IRA's Customer Transaction Agreement) all customer account data for the benefit of the account holder, for which Plaintiff was entitled to charge the account holder its standard fees. (*See* Trimboli Decl., Exh. D.) For this reason too, then, Plaintiffs have a possessory interest in the data.

16

As for the second factor—Plaintiffs' interest in the property was greater than KTC's interest—it too is met. In light of the KTC Custodial Agreement, Bitcoin IRA's possessory interest in the customer account data is superior to KTC's by virtue of the account holders' directives that KTC provide customer account data to Bitcoin IRA, as well as the account holders' directives that KTC transfer custodianship to BitGo Trust, to be serviced by Digital IRA utilizing the Bitcoin IRA online platform. In cases where KTC customers have requested that their IRA assets be transferred, Plaintiffs clearly possess a superior possessory right in the customer's account data, because customers have requested that KTC lose possession of the data through completion of the transfer.

Concerning the third factor—KTC exercised dominion or control over or seriously interfered with Plaintiffs' interest in the property—it is also met here. By intentionally and willfully disregarding account holders' designation of Bitcoin IRA as their chosen ADR, refusing to transfer account holders' property to BitGo Trust so that account holders can utilize the services of Digital IRA, and restricting Plaintiffs' access to customer account data, KTC has taken control of the customer account data that Bitcoin IRA is contractually entitled to possess for the benefit of its users. Thus, this factor is met here.

Finally, as for the fourth factor—KTC's conduct deprived Plaintiffs of their interest in the property—it is also met here. Through the aforementioned acts, including KTC's complete restriction of Plaintiffs' access to the account holder's data, KTC has deprived Plaintiffs of their interest in the data. (*See* Kline Decl. at ¶10.) As such, the fourth element is also met.

For all these reasons, Plaintiffs have established that they have a "fair chance of prevailing on the merits"– which again is all that is required at this stage. *See Heartland Acad. Comm. Church*, 335 F.3d at 690.

4. <u>Breach of Contract</u>

To establish a breach of contract, Plaintiffs must prove (1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages. *Berry v. Time Ins. Co.*, 798 F. Supp. 2d 1015, 1018 (D.S.D. 2011). All three elements are met here.

With respect to the first element—an enforceable promise—it is met here. As set forth above, Bitcoin IRA and KTC entered into a Referral Agreement, which is a valid and enforceable contract. (*See* Kline Decl. at 7, Exh. A.) Thus, the first element is here.

As for the second element—breach of the promise—it is also met here. On August 23, 2019, KTC breached paragraph 13 of the Referral Agreement by terminating Bitcoin IRA's access to customer data and shutting off the online platform unilaterally and effective immediately, thereby changing the terms and conditions of account holders' access to the Bitcoin IRA online platform without providing written notice at least thirty (30) days before the changes took effect. In addition, KTC breached paragraph 6 of the Referral Agreement by declaring the Referral Agreement terminated effective immediately, without providing Bitcoin IRA with advance written notice at least one hundred eighty (180) days prior.

Finally, with respect to the third element—resulting damages—the element is also met here. As a result of the aforementioned breaches, Plaintiffs have sustained damages, including but not limited to monetary damages and irreparable harm in the form of the loss of goodwill and business reputation. (*See* Kline Decl. at ¶25.)

### C. Plaintiffs' showing of irreparable harm reinforces the case for granting a temporary restraining order and preliminary injunction.

It is well-established that this Court may presume irreparable harm from a finding of probable success on the merits. *Calvin Klein Cosmetics Corp.*, 815 F.2d at 505 ("The court correctly noted that it could presume irreparable injury from a finding of probable success" on the merits); *see also Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1558 (Fed. Cir. 1996)

(patentee entitled to presumption of irreparable harm on clear showing of infringement and validity). Thus, this Court need not undertake this analysis if it has previously determined that Plaintiffs have demonstrated a probability of success on the merits of any of their claims. Based on the above analysis, the Court need not undertake the analysis here.

If the Court determines it is necessary to undertake the "irreparable harm" analysis, the applicable standard is not rigorous. "[T]he threshold inquiry is whether the movant has shown the threat of irreparable injury[.]" *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (emphasis supplied). The movant need only show the possibility of irreparable harm, not that the harm has occurred. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations … and, of course, it can be utilized even without a showing of past wrongs.") (citation omitted); *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472-73 (8th Cir. 1994) (preliminary injunction was justified based on a showing of a threat of irreparable harm); 11A Charles Wright, Alan Miller & Mary Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 155 (3d ed. 2013) ("the injury need not have been inflicted when application is made or be certain to occur").

"'Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Little Caesar Enterprises, Inc. v. Sioux Falls Pizza Co., Inc.*, CIV. 12–4111, 2012 WL 3190788, at *9 (D.S.D. Aug. 3, 2012) (quoting *Rogers Group, Inc. v. City of Fayetteville*, 629 F.3d 784,789 (8th Cir. 2010)) (other citations omitted). "If a party can establish that 'the harm is certain and great and of such imminence that there is a clear and present need for equitable relief[,]' then irreparable harm is shown." *Little Caesar Enterprises, Inc.*, 2012 WL 3190788 at *9 (quoting *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996)).

Relevant here, the Eighth Circuit has repeatedly held that loss of intangible assets, such as reputation and goodwill, constitute irreparable injury. *See, e.g., Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (affirming that consumer confusion, loss of consumer confidence, and loss of goodwill established a threat of irreparable harm); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742 (8th Cir. 2002) (finding that potential loss of reputation and goodwill among moving party's customers established threat of irreparable harm); *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 790 (8th Cir. 2010) (affirming the district court's finding of irreparable harm where movant presented evidence of loss of goodwill, including potential loss of customers and decreased business operations). Indeed, as recognized in *Medicine Shoppe International, Inc.*, "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Med. Shoppe Int'l, Inc.,* 336 F.3d at 805.

The evidence here shows more than the mere possibility of irreparable harm. By virtue of KTC's actions in preventing the transfer of assets to BitGo Trust and cutting off its account holders' access to the Bitcoin IRA online platform, Plaintiffs have sustained a loss of goodwill and business reputation. (*See* Kline Decl. at ¶25.) Prior to KTC's actions, customers were able to use the Bitcoin IRA platform and make transactions online using their desktops, laptops, or smartphones. (Trimboli Decl. at ¶22.) Additionally, customers were able to initiate transactions 24 hours a day, 7 days a week. (*Id.* at ¶23.) Indeed, many clients selected the Bitcoin IRA platform because they were concerned about security, accessibility, and convenience. (*Id.* at ¶3; Declaration of Jean Ishihara ("Ishihara Decl.") at ¶3.) Now, KTC's limited platform is a significant downgrade from the capabilities available to the customers using the Bitcoin IRA platform, and negatively impacts consumers. (Trimboli Decl. at ¶23.) Indeed, as set forth in the declaration of Chris Kline, Plaintiffs' clients are placing blame on Plaintiffs for the difficulties that they have encountered in

transferring their assets to BitGo Trust, and their inability to access their accounts using the Bitcoin

IRA online platform. (Kline Decl. at ¶24.) Additionally, customers are getting the run-around from

KTC in restoring Bitcoin IRA's access to their accounts. *(See* Ishihara Decl. at ¶¶13-20.) In that

regard, these difficulties are material and substantial.

By way of example, the market for cryptocurrencies is volatile in that prices can change

substantially in a short period of time. (*See* Kline Decl. at ¶23, Exh. I.) Thus, the ability of

Plaintiffs' customers to use the Bitcoin IRA online platform to buy and sell cryptocurrencies in

real time, 24/7, is crucial. As such, customers have deemed unrestricted access to the Bitcoin IRA

platform to make transactions as highly important, stating that they consider the convenience and

efficiency offered by the Bitcoin IRA platform to allow them to respond to volatile changes in the

cryptocurrency marketplace as part of their overall retirement investment strategy. *(See* Trimboli

Decl. at ¶24.)  However, now that KTC has cut-off access to the online platform and made self-

direction of the accounts exceedingly difficult (i.e., clients must now self-direct by manually

calling in to customer services representatives with extremely limited availability (*see id*. at ¶23)),

Plaintiffs' customers have a very real possibility of losing their retirement assets. Indeed, as

declared to by customer Roy Trimboli, "Kingdom's decision to terminate my access to the Bitcoin

IRA platform is damaging my ability to implement my investment strategies and manage my

investment accounts." (*Id.* Decl. at ¶25.) Further, customers can no longer use the Bitcoin IRA

platform and their Bitcoin IRA customer service representatives to easily check on the status of

their accounts or to conduct transactions. (Ishihara Decl. at ¶21.) Without unrestricted access to

Bitcoin IRA, customers are worried that they will be unable to buy or sell assets at the appropriate

time to maximize the value of their retirement investments. (Trimboli Decl. at ¶25.) Of course, to

the extent blame has been cast on Plaintiffs for the inoperability of the online platform, Plaintiffs' goodwill and reputation has been harmed.

As another example, as part of their service to their clients, Plaintiffs cross-check and monitor clients' accounts, routinely correcting KTC accounting errors and addressing overcharges by KTC against Digital IRA customers. This is especially critical, because many clients have reported that KTC has made numerous errors with respect to their IRA accounts, costing them hundreds of thousands of dollars. (Ishihara Decl. at ¶10.) Now that KTC has cut-off Plaintiffs' access to the clients' data, however, Plaintiffs can no longer perform this cross-checking and monitoring. In that regard, to the extent accounting errors and overcharges cannot be caught due to the lack of access, Plaintiffs' goodwill and reputation is further harmed.

Moreover, KTC's disparaging August 23, 2019 emails to its account holders directly impacted Plaintiffs' business reputation. Prior to August 2019, Plaintiffs enjoyed high customer ratings, customer confidence, and a credible reputation in the cryptocurrency IRA industry. After KTC emailed its account holders on August 23, 2019 that it was terminating its relationship with Bitcoin IRA for "security" reasons, account holders emailed and called Plaintiffs' customer representatives with concerns about the status of their accounts and ability to monitor their retirement accounts. Such customer confusion, loss of consumer confidence, and erroneously placed-blame on Plaintiffs—all caused directly by KTC—evidences harm to Plaintiffs' reputation in the cryptocurrency IRA industry, highlighting the need for immediate injunctive relief. *See Med. Shoppe Int'l, Inc.,* 336 F.3d at 805.

For all the foregoing reasons, Plaintiffs will suffer irreparable harm if the requested injunctive relief is not issued. Thus, this *Dataphase* factor weighs heavily in favor of the issuance of injunctive relief.

**D. The "balance of the harms" favors entry of the temporary restraining order and preliminary injunction.**

The analysis of the "balance of harms" factor is simple. More harm will result to Plaintiffs if the status quo remains in place than will befall KTC if KTC is required to restore access to the data and the Bitcoin IRA online platform. KTC will suffer no harm by restoring such access. Indeed, as set forth above, KTC is contractually required to retain Bitcoin IRA as the ADR, and cannot unilaterally alter or terminate the Referral Agreement without sufficient notice and time. Moreover, KTC is currently collecting service and maintenance fees while the account holders remain with KTC (as opposed to with BitGo Trust as the account holders requested).

By comparison, Plaintiffs face a severe and imminent risk of harm if KTC is permitted to continue withholding access to the account holder data and Bitcoin IRA online platform. As set forth above, such restrictions harm Plaintiffs in numerous ways, including but not limited to: the loss of good will and reputation, the loss of current and prospective customers, and resulting economic harm.

For all the foregoing reasons, the balance of the harms analysis weighs decisively in favor of Plaintiffs.

**E. The public interest is best served by enjoining KTC from restricting Plaintiffs' access to account holder data, which is directly contrary to account holders' explicit directives.**

The final *Dataphase* factor, which involves consideration of public policy, also favors the issuance of injunctive relief. Given KTC's restriction of access to the data and Bitcoin IRA's online platform, KTC is holding departing account holders hostage. As set forth above, due to KTC's actions, account holders can no longer access and self-direct their accounts online, and must

instead resort to calling KTC directly during very limited hours and with limited staff, usually resulting in extraordinarily long wait times. In that regard, the public has an interest in ensuring that individuals have the ability to self-direct their retirement accounts in real time with 24/7 access. Such limitations also restrict the account holder's ability to transfer their account to their preferred custodian – directly conflicting with the public's right to monitor and control their retirement funds.  Moreover, KTC's limitations have caused both current and prospective account holders to lose faith in the cryptocurrency IRA industry, as they now question the stability of placing their retirement funds in any crypto platform.

Additionally, Plaintiffs have lost the ability to monitor KTC's activity over customer accounts. As described above, Plaintiffs previously had access to KTC account holder data, serving as an administrative watchdog to confirm that KTC managed accounts according to directions by the account holders themselves. In particular, by checking KTC's account holder data, Plaintiffs routinely verified the amount of crypto inventory in accounts; corrected overcharges made by KTC; and corrected errors in accounting transactions. Plaintiffs now cannot do so. Indeed, because KTC unilaterally terminated its relationship with Plaintiffs, Plaintiffs have lost the ability to advocate for their customers and verify that KTC is operating pursuant to customer directives. This greatly jeopardizes the safety of KTC account holders' retirement assets and erodes confidence that KTC will protect well-earned retirement assets. (*See* Ishihara Decl. at ¶22.) As such, the analysis weighs decisively in favor of entry of the injunction.

## CONCLUSION

For the reasons set forth in this Motion and accompanying brief, Plaintiffs respectfully request that the Court grant their Motion for Temporary Restraining Order and Preliminary Injunctive Relief. Plaintiffs further request that the Court set a hearing as soon as the Court's

24

schedule permits. Plaintiff also respectfully requests that this Court waive the bond requirement of

Federal Rule of Civil Procedure 65(c) because the Defendant will not suffer any significant costs

or damages if compelled to return to the status quo.

                                        Respectfully submitted,

Dated:  August 28, 2019                 Cadwell, Sanford, Deibert & Garry, LLP

                                        ____/s/  Shawn Nichols_____
                                        Shawn Nichols
                                        200 E. 10th Street, Suite 200
                                        Sioux Falls, South Dakota 57104
                                        Telephone: (605) 336-0828
                                        snichols@cadlaw.com
                                        Attorney for Plaintiffs
                                        DIGITALIRA.COM, LLC and ALTERNATIVE
                                        IRA SERVICES, LLC